**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| EDGE NETWORKING SYSTEMS LLC,<br>*Plaintiff*,<br>v.<br>AMAZON.COM, INC., AMAZON.COM SERVICES LLC, *and* AMAZON WEB SERVICES, INC.,<br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:24-CV-00887-JRG-RSP |

**CLAIM CONSTRUCTION ORDER**

Before the Court is Plaintiff's Opening Claim Construction Brief (Dkt. No. 82) filed by Edge Networking Systems LLC ("Edge"). Also before the Court is the Defendant's Responsive Claim Construction Brief (Dkt. No. 91) filed by Amazon.com Services LLC ("Amazon"), along with Plaintiff's Reply Claim Construction Brief (Dkt. No. 98).

The Court held a hearing on February 10, 2026. Having considered the parties' briefing, submitted evidence, and arguments from counsel, the Court resolves the disputes as ordered herein.

## I. BACKGROUND

Plaintiff alleges infringement of seven patents in the same family: U.S. Patent No. 10,686,871 ("the '871 Patent"), U.S. Patent No. 10,893,095 ("the '095 Patent"), U.S. Patent No. 11,695,823 ("the '823 Patent"), U.S. Patent No. 12,113,850 ("the '850 Patent"), U.S. Patent No. 12,113,851 ("the '851 Patent"), U.S. Patent No. 12,126,673 ("the '673 Patent"), and U.S. Patent No. 12,126,674 ("the '674 Patent") (collectively, "the Asserted Patents"). The Asserted Patents relate to distributed software defined networking ("dSDN") technology. In particular, cloud-side components and device-side components that work together to host distributed applications, allowing for flexible programmability across the network.

Edge asserts the ’871 and ’095 Patents in a parallel case against Microsoft in the Western District of Texas. *Edge Networking Sys., LLC v. Microsoft Corp.*, No. 1:24-cv-00215 (W.D. Tex.) (the “Microsoft” case). The parties’ positions in those proceedings have been raised as evidence regarding certain disputed terms.

The ’871, ’095, ’823, and ’673 Patents are all titled “Distributed Software Defined Networking.” The ’850 Patent is titled “Method for Managing Updates to a Distributed Network with No Interruption to Operations.” The ’851 Patent is titled “Method for Managing Updates to a Distributed Network Independent of Hardware.” And the ’674 Patent is titled “Method for Managing Updates to a Distributed Network Through an Application Management Portal.” The Asserted Patents share an Abstract, which is set forth as follows:

> The Distributed Software Defined Network (dSDN) disclosed herein is an end-to-end architecture that enables secure and flexible programmability across a network with full lifecycle management of services and infrastructure applications (fxDeviceApp). The dSDN also harmonizes application deployment across the network independent of the hardware vendor. As a result, the dSDN simplifies the network deployment lifecycle from concept to design to implementation to decommissioning.

## II. LEGAL STANDARDS

“‘The claims of a patent define the invention to which the patentee is entitled the right to exclude.’” *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure-Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). “[T]he court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim.” *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff’d,* 517 U.S. 370, 390 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must

contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

When construing claims, "there is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.,* 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips,* 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

There are, however, two exceptions to this rule. The first exception is when a patentee sets out a definition and acts as his own lexicographer. The second exception is when the patentee disavows the full scope of a claim term either in the specification or during prosecution. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed. Cir. 1996).

The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). As the Supreme Court stated long ago, "in case of doubt or ambiguity it is

proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

But "where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). "The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). "Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language." *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004). A disavowal or disclaimer must be clear and unmistakable. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012),

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim

construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

Intrinsic evidence, therefore, is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.,* 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips,* 415 F.3d at 1312). But for claim terms with less-apparent meanings, courts consider " 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean, [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.' " *Phillips,* 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116). In those situations, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

However, the intrinsic record may not be sacrificed in favor of extrinsic evidence. According to *Phillips*, reliance on dictionary definitions, for example at the expense of the

specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.

The Supreme Court of the United States has read 35 U.S.C. § 112, ¶ 2 "to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910, 134 S. Ct. 2120, 2129 (2014). "A patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* The claims "must be precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for the inherent limitations of language. *Id.* at 908. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. AGREED TERMS

The parties have reached agreement on the following term as reflected in their Joint Claim Construction Chart Pursuant to P.R. 4-5(d) (Dkt. No. 100):

| Claim Term | Agreed Construction |
| --- | --- |
| "sandboxing operat[ing/ion] system"<br><br>('871 Patent, Claims 1, 9, 11;<br>'095 Patent, Claims 1, 15, 17;<br>'850 Patent, Claims 1, 8, 15;<br>'674 Patent, Claims 1, 15, 19) | "an operating system that ensures each application runs as a dedicated process in sure isolation from other applications" |
| "distributed application[s]"<br><br>('871 Patent, Claims 1, 9, 11;<br>'095 Patent, Claims 1, 15, 17;<br>'823 Patent, Claims 1, 3-4, 19;<br>'850 Patent, Claims 1, 8, 15;<br>'851 Patent, Claim 3; | "an application that has a component on a cloud device paired with another component on a network device" |

| | |
|---|---|
| ’673 Patent, Claims 1, 3-4, 19;<br>’674 Patent, Claims 1, 15, 19) | |

## IV. DISPUTED TERMS

### 1. “programmable network device”

| Claim Term | Plaintiff’s Construction | Defendant’s Construction |
|---|---|---|
| “programmable network device”<br><br>(’871 Patent, cl. 1-2, 4-6, 8-9, 11;<br>’095 Patent, cl. 1, 3, 7-8, 15, 17;<br>’823 Patent, cl. 1-2, 9-10, 13, 16, 18-19;<br>’850 Patent, cl. 1-2, 7-8, 14-15;<br>’851 Patent, cl. 1-5, 7-8, 10-18;<br>’673 Patent, cl. 1-2, 9-10, 13, 16, 18-20;<br>’674 Patent, cl. 1-4, 7, 15) | “a network device powered by a sandboxing operating system” | “networking equipment embedded with a sandboxing operating system” |

The first disputed term, “programmable network device,” appears across all seven Asserted Patents. The core question is whether the term carries its plain and ordinary meaning or whether the specification provides a restrictive definition requiring: (a) that the device constitute “networking equipment,” and (b) that a sandboxing operating system be “embedded” in the device.

In its Opening brief, Plaintiff initially proposed plain and ordinary meaning. In its Reply, however, Plaintiff adopted the construction it had proposed in the related case *Edge Networking Sys., LLC v. Microsoft Corp.*, No. 1:24-cv-00215 (W.D. Tex. Sep. 22, 2025), for the sake of consistency: “a network device powered by a sandboxing operating system.” Plaintiff disagrees with Defendant’s proposal of requiring the device to constitute “networking equipment” because the specification’s statements about the fxDevice (the embodiment of a programmable network device) are exemplary and contextual, not definitional, and therefore do not rise to the level of lexicography or disavowal. Plaintiff further contends that Defendant’s proposed addition of the

word "embedded" would improperly narrow the claim by implying the sandboxing operating system must reside inside the device, a requirement not found in the claims. Plaintiff notes that four of the asserted patents have claims reciting the programmable network device's sandboxing operating system are "powering" the device, not one "embedded" within it, and three patents' claims (the '823, '851, and '673 Patents) include no sandboxing limitation at all. Importing "embedded" would therefore read across claim limitations in a manner the patentee deliberately avoided.

Defendant responds that the specification expressly defines "programmable network device" through its description of the fxDevice. Defendant relies on two sentences in the specification: (1) "The fxDevice 302 is a network device that is powered by a sandboxing operating system named flexible operating system (fxOS) 302a" ('871 Patent 10:17-19); and (2) "fxDevice 302 is defined as any networking equipment embedded with a special flexible operating system (fxOS) 302a" (*id*. at 10:63-65). Defendant contends that the word "defined" in the second sentence constitutes express lexicography and that the specification's consistent use of "fxDevice" as a synonym for "programmable network device" makes the definition equally applicable to the claim term. Defendant further argues that "networking equipment" is necessary to give the word "network" in the claim term its full weight because Plaintiff's infringement contentions map the limitation to devices that perform no networking function.

Claim 1 of each patent is representative of how "programmable network device" is used across the asserted claims, though the claims are not identical in scope. The '871 and '095 Patents recite "the programmable network device . . . powered by a sandboxing operating system," and the '850 and '674 Patents recite "powering the programmable network device . . . by a sandboxing operating system." The '823, '851, and '673 Patents recite a "programmable network device"

without any sandboxing limitation whatsoever. Critically, none of the claims across any of the seven patents use the word "embedded." The claims say the device is "powered by" a sandboxing operating system; they do not say the operating system is "embedded with" or inside of the device. These are meaningfully different concepts. "Embedded" carries a narrower connotation suggesting the operating system is physically or permanently integrated into the hardware, whereas "powered by" describes the operating relationship between the device and the operating system at a higher level of abstraction.

The preamble of Claim 1 of the '871 Patent is a "system for processing data packets in a network." This context bears on the proper scope of the term. The word "network" in the disputed term and the network on which the "programmable network device" operates must be given context when read in view of the patent as a whole. The Asserted Patents are directed to distributed software defined networking architecture. Thus, the term "programmable network device" is not so broad as to extend to any device that happens to be connected to a network. At the same time, the claim language does not require "networking equipment" in the specialized sense Defendant proposes. Rather, the claim term "network device" is sufficient to convey that the device must perform, or be capable of performing, network-related functions such as routing, switching, or serving as a base station or access point. Whether any particular accused product constitutes a "network device" in this sense is a question of fact for the jury at the infringement stage, not a question of claim scope for the Court to resolve at Markman.

The Court also notes that Defendant conceded during oral argument that the programmable network device does not have to be hardware. This concession underscores that "networking equipment," with its connotation of tangible hardware, would impose an unwarranted narrowing.

The proper construction gives "network" its due weight without importing hardware-specific limitations.

Turning to the specification, Defendant's proposed construction is derived from two sentences that describe the fxDevice. The fxDevice is identified as an embodiment of the claimed invention in the context of a "high-level overview of a dSDN system" depicted in FIG. 3. ('871 Patent at 10:10-13.) The first sentence describes what powers the fxDevice: "The fxDevice 302 is a network device that is powered by a sandboxing operating system named flexible operating system (fxOS) 302a." (*Id.* at 10:17-19.) The second sentence purportedly defines what the fxDevice is: "fxDevice 302 is defined as any networking equipment embedded with a special flexible operating system (fxOS) 302a." (*Id.* at 10:63-65.)

Neither sentence constitutes express lexicography for the claim term "programmable network device." "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). The analysis fails at the threshold because the specification never uses the phrase "programmable network device" in either of these sentences—it uses the specific embodiment labeled "fxDevice 302." This distinction matters. If the patentee intended to define "programmable network device" through these sentences, it would have used the claim term itself. The fact that the patentee instead labeled the embodiment with a distinct, proprietary name "fxDevice" indicates that the passage describes one example of the claimed device, not a universal definition of the claim term. This is corroborated by the fact that the specification contains a dedicated definitions section spanning columns 3 through 6 in which neither "fxDevice" nor "programmable network device" is expressly defined.

Defendant's reliance on the word "defined" in the second sentence does not change the analysis. In *Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mut. Pharm. Co*., 384 F.3d 1333, 1339 (Fed. Cir. 2004), the Federal Circuit only found lexicography where the specification stated that "the solubilizers suitable according to the invention are defined below," and then provided an explicit definition of the disputed claim term "solubilizers." The *Astrazeneca* court emphasized the exact parallel language between the specification and claims when it came to clear definitions and was careful to note that had the reference said "***a*** solubilizer," instead of the "solubilizers," that might not be sufficient to establish lexicography. Here, the specification lacks a clear definition. It refers not to "the programmable network device" or even "a programmable network device," but to "fxDevice 302," which is a specifically labeled component of an exemplary embodiment. The Court does not find lexicography exists here.

Moreover, Defendant is not proposing to adopt either specification sentence verbatim. It substitutes "sandboxing" for the specification's phrasing of "special flexible" and draws from two separate sentences to combine "networking equipment," "embedded with," and "sandboxing operating system" into a single construction. The Court declines to adopt constructions cobbled together from multiple specification passages, as they evidently lack the requisite clarity for lexicography. The specification does not contain an express definition that would limit "programmable network device" to "networking equipment embedded with a sandboxing operating system."

For the foregoing reasons, the Court finds that **"programmable network device" means "a network device powered by a sandboxing operating system."**

**2. "application management portal"**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "application management portal"<br><br>('871 Patent, cl. 1, 7, 9, 11;<br>'095 Patent, cl. 1, 8, 15, 17;<br>'823 Patent, cl. 3-5, 19;<br>'850 Patent, cl. 1, 8, 15;<br>'851 Patent, cl. 4, 17-18;<br>'673 Patent, cl. 3-5, 19-20;<br>'674 Patent, cl. 1, 8, 15, 19) | "portal for a network administrator to manage the lifecycle of an application"<br><br>Not governed by 35 U.S.C. § 112(f).<br><br>Alternatively, if subject to 35 U.S.C. § 112(f):<br><br>Structure: user interface and associated software<br><br>Function: claimed function | Subject to 35 U.S.C. § 112(f)<br><br>Function: claimed function<br><br>Structure: indefinite / insufficient structure |

The disputed term, "application management portal," appears in claims across all seven patents. The central question is whether "application management portal" is a structural claim term that should receive a substantive construction, or whether it is a functional abstraction, a "nonce term," subject to means-plus-function treatment under 35 U.S.C. § 112(f). If the latter, the further question is whether the specification discloses sufficient corresponding structure to perform the claimed functions, or whether the term is indefinite.

Plaintiff argues that "application management portal" is a structural term that does not invoke § 112(f). Because the claims do not use the word "means," there is a presumption against means-plus-function treatment, and Plaintiff contends Defendant has not overcome it. Plaintiff points to the claim language itself, which recites the portal as being "coupled to the programmable network device and programmable cloud device," as a description of physical connections that a person of ordinary skill in the art would understand to be structural. Plaintiff also argues that the individual words comprising the term—"application," "management," and "portal"—are each

known in the art, and that their combination describes a "portal for a network administrator to manage the lifecycle of an application." The specification, Plaintiff notes, consistently describes the application management portal (fxManager) as a user-friendly interface through which a network administrator interacts with the distributed application system. In the alternative, Plaintiff argues that even if the Court finds § 112(f) applies, the specification discloses sufficient structure to perform the claimed functions, such that the term is not indefinite.

Defendant argues that "application management portal" is a coined nonce term that performs the same function as "means for" without using that language. Defendant contends that neither "portal" in isolation nor the combination of the three words conveys definite structure to a skilled artisan in the relevant sense. The term describes, at most, what the portal does, not what it is. For computer-implemented functions, Defendant argues, the Federal Circuit requires that the specification disclose more than a general-purpose computer; it must disclose a specific algorithm for performing the claimed functions. Defendant contends the specification fails to provide any such algorithm and that Plaintiff's admissions in the *Microsoft* Markman proceedings in which Plaintiff described the application management portal as "a general-purpose computer providing general functions," confirm that the term cannot satisfy the structure requirement for computer-implemented means-plus-function claims.

The Court begins its analysis by noting that section 112(f) of Title 35 provides that an element in a combination claim "may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." Because "application management portal" does not use the word "means," there is a rebuttable presumption that § 112(f) does not apply. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (*en banc*). This presumption "can be overcome if the challenger demonstrates that the claim term fails to

'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id*. The question, therefore, is whether "application management portal" connotes sufficiently definite structure to one of skill in the art, or whether it is merely a functional placeholder.

An examination of how the term is used in the representative claims reveals that the "application management portal" is not a functional abstraction. Rather, it is a structural component with defined physical connections and specific operational roles.

Claim 1 of the '871 Patent is illustrative, as reproduced below, with the disputed term in bold:

> 1. A system for processing data packets in a network, the system comprising:
>
> a programmable network device hosting a plurality of first network applications;
>
> a programmable cloud device hosting a plurality of second network applications, wherein at least one of the plurality of first network applications in the programmable network device and at least one of the plurality of second network applications in the programmable cloud device are in secure communication with each other through a virtual fabric to form a distributed application;
>
> wherein the programmable network device and programmable cloud device are each powered by a sandboxing operating system which facilitates deployment of the plurality of first and second network applications;
>
> an **application management portal** coupled to the programmable network device and programmable cloud device and capable of managing upgrades of the first and second network applications with substantially no interruption to operation of the programmable network device and programmable cloud device;
>
> wherein the **application management portal** verifies authenticity of the upgrades to the plurality of first network applications and the plurality of second network applications and wherein the verification is based on unique security keys associated with each of the plurality of first and second network applications;

> an application repository coupled to the **application management portal** and capable of storing distributed applications for installation in the programmable network device and programmable cloud device; and
>
> wherein the **application management portal** further manages usage of the distributed applications on the programmable network device and programmable cloud device.

As shown, claim 1 recites a system in which the application management portal is: part of a "system for processing data packets in a network"; "coupled to the programmable network device and programmable cloud device"; "coupled to" an application repository; "capable of managing upgrades" of network applications; capable of "verifying authenticity of the upgrades . . . based on unique security keys"; and capable of "storing distributed applications for installation."

Claim 3 of the '823 Patent further recites the portal as being "in communication" with "an infrastructure application marketplace."

These are structural connections. Tangible coupling to identified hardware components and a storage repository are not consistent with a pure functional abstraction.

Defendant argues that coupling describes location, not structure. But the physical connections in the claims here are specific. The portal is coupled to two distinct hardware components (the programmable network device and the programmable cloud device) and to a storage repository, which is likely also hardware. It is further characterized by the ability to manage, verify, and store software applications. Taken as a whole, the claim language provides meaningful structural context.

In addition, none of the three words in "application management portal" is a generic nonce term like "module," "mechanism," "means," or "unit." Defendant itself concedes that "portal" and "application" are individually known terms in computer science. (*See* Dkt. No. 91 at 18.) "Portal" in the computing context has a recognized meaning as a gateway to a website or user interface

through which users interact with a system. The specification consistently uses "portal" in this structural sense: "The fxManager 306 presents a user-friendly portal to the network administrator . . . ." ('871 Patent at 10:51-53); "The fxManager portal could use HTML5, for example, as a frontend technology." (*Id*. at 15:21-23.) FIG. 7 depicting a user interface is expressly labeled "an exemplary view of the fxStore Portal."

"Management" is similarly a well-understood term. The specification defines it in terms of concrete activities: "Virtual Machine lifecycle management (e.g. creation, suspension, destruction)." (*Id*. at 15:4-5.) And "application" is used throughout the claims and written description without objection from either party as to the clarity of its meaning.

Putting the three words together into "application management portal" does not render the individual words meaningless nor alter their well-known connotation. Neither party's expert has testified that he does not understand these three words. The Court is persuaded that, as the individual words are understood in computer science, one of ordinary skill in the art would similarly understand the complete phrase to refer to a user interface for managing applications. This logic is not circular. It reflects the structural understanding that a portal is a type of interface, and that this particular interface is oriented toward managing applications within the dSDN system.

The specification further supports a structural construction of the disputed term. The specification extensively describes the application management portal (fxManager) as a structural component of the dSDN system. The dSDN system "consists of a flexible network device (fxDevice) 302, a flexible cloud platform (fxCloud) 304, ***an application management portal (fxManager) 306***, and an infrastructure application market place (fxStore) 308." (*Id*. at 10:13-17.) Notably, Defendant does not argue that any of the other three architectural components of the dSDN system are nonce terms or invoke § 112(f). Defendant's expert, Dr. Easttom II, described

the invention as "a system having a certain architecture" whose "two main cooperating components" are the fxDevice and the fxCloud, and identified the fxManager and fxStore as additional such components. (Dkt. No. 91-11 ¶51.) Yet only the fxManager is challenged as functional claiming. The inconsistency undermines Defendant's position.

Moreover, the specification provides numerous structural descriptions of the fxManager beyond merely listing what it does. It "presents a user-friendly portal to the network administrator." ('871 Patent at 10:51-53.) It can have an "Account" button, include a "geographical map illustrating locations of fxDevices and their status," and build an "inventory of the network devices (fxDevices) showing all the available devices and statistics." (*Id*. at 16:29-33, 15:30-33.) It "could use HTML5, for example, as a frontend technology." (*Id*. at 15:21-23.) It can be "integrated into other network management tools." (*Id*. at 15:24-25.) The specification also describes in detail the fxManager's lifecycle management functions in a dedicated section spanning columns 15 through 16.

Additional support for the structural understanding of "application management portal" is found in the parent patent family. U.S. Patent No. 9,843,624 is parent to the '871 Patent and shares the same specification. It expressly recites that the "application management portal presents a user interface." The claim language in the parent patent thereby confirms that a user interface is a feature of the application management portal that the patentee understood and claimed across the patent family. As all patents in the family share the same specification, this validation of structural meaning carries weight in interpreting the same term across the asserted patents.

This understanding is further supported by expert testimony. Plaintiff's expert, Dr. Valerdi, opines that a skilled artisan would understand the application management portal to comprise at least one server and that "the functionalities associated with the application management portal

make the structure of the term apparent to a POSITA." (Dkt. No. 82-9 ¶54.) Dr. Valerdi explains that the term "is additionally a known structure because the specification describes it as a user interface with underlying software to manage the dApps on a cloud network." (*Id.* ¶55.)

In addition, Dr. Easttom II, Defendant's expert, concedes that "portal" has been "historically known in computer science as an entrance to websites," yet argues the term nevertheless functions as a placeholder like "means." Dr. Easttom's position is difficult to reconcile with his own concession and with the specification's repeated and concrete descriptions of the fxManager's interface. Dr. Easttom also fails to opine on whether the detailed claimed functionalities, combined with the disclosed structural connections, would enable one of skill to ascertain the scope of the invention. Between the two experts, the Court finds Dr. Valerdi's testimony to be more credible and therefore more persuasive.

Plaintiff's statements in the *Microsoft* case are not instructive on whether the disputed term invokes § 112(f). The question of whether a structural term (one that is not means-plus-function) can be implemented by a general-purpose computer is a separate question from whether § 112(f) applies in the first place. That the portal can be implemented on a general-purpose computer does not mean it lacks sufficient structure. Rather, the claim term here describes the type of component (a user-interface portal for managing applications), not the underlying computational substrate on which it runs.

For the foregoing reasons, the Court does not find that the "application management portal" is a "step for" performing a function. It is not a means-plus-function claim. Instead, it is a user interface component within a network system with defined physical connections, a structural name understood in the art, and extensive specification support. Defendant has failed to overcome the

presumption against § 112(f) treatment. The term is structural, and the Court need not reach the question of whether the specification discloses sufficient corresponding structure.

Accordingly, the Court finds **"application management portal" is not a means-plus-function term under 35 U.S.C. § 112(f) and means "a user interface for managing applications."**

## V. CONCLUSION

The Court adopts the constructions as set forth in this opinion for the disputed terms of the Patents-at-Issue.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 8th day of March, 2026.**

Roy S. Payne

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE